E-FILED
Friday, 19 October, 2012  01:33:15 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
# PEORIA DIVISION

| | | |
|---|---|---|
| KATHERINE BAER-BURWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-1309 |
| | ) | |
| CITY OF PEORIA, ILLINOIS, STEVEN | ) | |
| SETTINGSGAARD, MICHAEL FALATKO, | ) | |
| MICHAEL BOLAND, CHRISTOPHER HAUK, | ) | |
| AARON ZABORAC, and MARK LAMB, | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

This matter is now before the Court on Motions for Summary Judgment by Defendants. For the reasons set forth below, the Motion for Summary Judgment by Defendants Hauk, Lamb, and Zaborac [55] is GRANTED IN PART and DENIED IN PART.  The Motion for Summary Judgment by Defendants Peoria Police Department, Falatko, Boland, Settingsgaard, and the City of Peoria [57] is also GRANTED IN PART and DENIED IN PART.

## INTRODUCTION

The Complaint alleges 3 counts: (1) a violation of Burwell's 14th Amendment rights and a violation of 42 U.S.C. §1983 against all Defendants for hostile work environment, gender discrimination, and retaliation; (2) a violation of Title VII against the City for hostile work environment, gender discrimination, and retaliation, and (3) a claim of assault and battery against Boland, Hauk, Zaborac and Lamb.  Defendants Hauk, Lamb, and Zaborac, officers of the Peoria Police Department ("PPD"), Sergeants Falatko and Boland, Superintendent/Chief Settingsgaard,

and the City of Peoria have filed Motions for Summary Judgment, to which the Plaintiff has

responded. The issues have been fully briefed, oral arguments have been made, and this Order

follows.

## BACKGROUND

There is much disagreement over the facts themselves, let alone which ones constitute

material or immaterial facts.  Given their sheer number and the fact that they are full of argument

and conjecture, the facts are addressed, for purposes of the Motions and this Order, in summary

fashion.  Keeping in mind that the facts are disputed, but that genuine disputes of fact must be

construed in favor of the non-moving party at the summary judgment stage, the facts specific to

each police officer defendant as alleged by Plaintiff are addressed individually as to each

Defendant.

Plaintiff, Katherine Baer Burwell ("Burwell"), and Defendants Christopher Hauk

("Hauk"), Mark Lamb ("Lamb"), and Aaron Zaborac ("Zaborac") were each Officers with the

Peoria Police Department ("PPD").[1]  Defendants Michael Falatko ("Falatko") and Michael

Boland ("Boland") are Sergeants with the PPD and at certain times, supervised the Officers.

Defendant Steven Settingsgaard is the Chief of Police.

Generally, the Officers are alleged to have made demeaning comments within the first

few months of Burwell being assigned to the Violent Crimes Unit ("VCU").  Part of the job

duties of an officer with the PPD is to provide supervision or guidance to less experienced

officers and to create and maintain effective working relationships.  This is especially true with

---

[1] Defendants Hauk, Lamb, and Zaborac are referred to collectively throughout this order
as the "Officers."

respect to new officers.  In particular areas such as interviewing witnesses and/or suspects and

writing search warrants, more experienced officers could greatly assist those less experienced.

Burwell was transferred to VCU in 2004 and initially had no issues.  However, as time

went on, the Officers are alleged to have commented on her breasts, stared at her breasts, told her

she had to run around the desk topless in order to be initiated into the VCU, thrown objects at

her, insulted her, suggested that she has her job because of her father's friendship with the then

Assistant Chief of Police, told her VCU was a man's world, refused to help her with job duties,

and shunned her, among other things.  The remaining named Defendants are alleged to have

allowed this to take place.

### Defendant Hauk

Hauk was a senior officer in the VCU.  Burwell first met Hauk in 1999 and got along well

with him, even socializing outside of work with him.  When they were both detectives in the

Juvenile Division, Hauk began harassing Burwell, starting with walking by her desk and flicking

minimal amounts of water on her somewhere between 5-10 times.  The water flicking stopped

once they were both transferred to VCU, but the harassment did not.  Once they were in VCU,

Hauk, as well as others, allegedly tried to look down her shirt.  Hauk also refused to assist

Burwell with her work, specifically refusing to help her interview a person of interest in a murder

case, when she had been in the VCU for only 7 days.  Allegedly, he also accused her of failing to

follow proper procedures.  On two occasions, Hauk further refused to help her interview suspects

in custody related to cases that he was investigating.  Burwell spoke to Falatko, informing him

that Hauk refused to help her, and Falatko in turn spoke to Hauk.  Hauk stated he was not going

3

to help her and no further action was taken.  On many of the occasions when Burwell requested assistance, Hauk was unoccupied and doing non-duty related things, like surfing the internet.

On August 27, 2007, Burwell responded to an armed robbery involving a shooting by an officer, and Hauk was assigned as the officer in charge of the scene.  Hauk only allowed her to interview one witness and then took over the interview of another.  Burwell was assigned to video-tape the interviews.  Burwell was again assigned video-taping duties by Hauk on a murder in December 2009 while numerous male detectives from various divisions were allowed to interview suspects.

Hauk also threw a stuffed bird and rubber balls at her, had a mirror on his desk so he could look behind him to where Burwell sat in order to stare at her, laughed when another detective said she should run around her desk topless as initiation into the VCU, made derogatory comments to her, and shunned her.  Hauk also made a comment during roll call in 2007 that the only reason Burwell had her job was because of her father and told her VCU was a man's world.  On one occasion, Hauk left a department vehicle "trashed" and empty of fuel, knowing that Burwell would be the next to use the vehicle.  On another occasion, Burwell injured her hand and Hauk and Zaborac said that she did not really injure herself and was being treated better than other officers with injuries.  Finally, when Hauk, Burwell and others were drinking socially at a bar, Hauk took Burwell's cell phone, found a picture of her bare breasts and sent that photo another police officer.

**Defendant Lamb**

Lamb was another more experienced officer.  He was charged with training and assisting less experienced officers if they asked for or needed assistance.  Despite this, Lamb refused to

help Burwell on numerous occasions from 2004-2007 in both the Juvenile and VCU divisions. His refusal to help Burwell interfered with her ability to do her work. Lamb was only assigned to work with Burwell on one occasion and excluded her from field work, choosing to work with Hauk instead while Burwell was relegated to watching suspects in custody.

Lamb also repeatedly threw a stuffed bird and a rubber ball at Burwell, once hitting her in the breast and leaving a bruise. Like Hauk, he shunned her. Prior to October 2, 2007, no one ever discussed with Lamb that there were any problems. In 2004 or 2005, Lamb told Burwell that she did not need to eat anything because she was fat enough; this statement occurred when she was pregnant.

### **Defendant Zaborac**

Zaborac was also a more experienced officer in the VCU. He offered to assist other less experienced officers and was lauded in his evaluations for doing so. He never experienced problems getting help from other officers when he needed it. Zaborac repeatedly refused to help Burwell and on one occasion, made his daughter's birthday invitations rather than helping her. Zaborac only recalls being assigned to one case with Burwell, when they were Juvenile, but does not recall specifically how he assisted her. No one ever spoke to Zaborac about his actions before or after Burwell's 2007 complaint.

Zaborac was allowed to hang his coat on partitions in the criminal investigation bureau, as were other male officers, while Burwell was not. He also threw rubber balls or a stuffed bird at Burwell and shunned her. Zaborac is alleged to have made hundreds of comments referring to the size of Burwell's breasts, suggested that the two of them "get together," and made other vague inappropriate remarks. These comments were made at least weekly between mid-2005 to

5

October 2007.  Burwell allegedly responded with remarks like "ha ha funny" and began crossing

her arms or rolling her eyes as the remarks continued.  She says this was intended to

communicate that she wanted the comments to stop.  These acts ceased in October 2007.

From mid-2005 to 2007, Zaborac attempted to throw items such as candy down Burwell's

shirt.  She initially responded by throwing the candy back, and then started saying things like

"knock it off".  Zaborac says this was playful and a game; she denies it was a game.  The record

indicates that Burwell and Zaborac also doctored photos of one another and sent them to each

other as jokes.  In one such photo, Burwell was made to be a witch, which she argues is worse

than others created by officers such as having phony black eyes, missing teeth, etc.

### Defendant Sergeants Falatko and Boland

In the PPD, sergeants were charged with a number of duties, including evaluating

employees who they supervised.  Also, they participated, as members of a larger team, in

interviews to determine which applicants would be chosen to fulfill openings within the detective

ranks.  Sergeants have a duty to prevent and correct sexual harassment and hostile work

environments.  This duty is set forth in the City's "Workplace Violence Prevention and Anti-

Harassment Policy" and the Peoria Police Department's general order regarding discrimination

and harassment.  Pursuant to this policy, supervisors should document all complaints of

harassment.

### Defendant Falatko

Falatko was a sergeant and first worked with Burwell in the Juvenile division.  Falatko

told Burwell she could not hang her coat on a partition, which he said was an order from then-

Captain Philip Korem.  When Burwell returned from a vacation, Falatko asked her why she had

6

nothing to work on, despite the fact that he was in charge of making assignments. Falatko also asked Burwell to complete her reports in a specific manner, i.e., dictate them, which she believed was different from other detectives. He also is alleged to have stared at her breasts and failed to stop the behavior of other detectives that she complained about.

Burwell complained to Falatko in January 2008 that other detectives, specifically Hauk, Lamb and Zaborac refused to help her, but he did not follow up or order those detectives to assist her. Burwell made this complaint on other occasions, and he never followed up or ordered anyone to assist her. Following the incident with Hauk making the remark during roll call and the incident in which she was struck with the rubber ball, Falatko spoke with Hauk and asked Burwell to write a special report detailing the incident with the ball. The following day after Falatko spoke to Hauk and Zaborac, he spoke to Burwell. She told him she was offended by the comments about her father and Falatko stated he thought the air had been cleared about that. When she responded that it happens on a daily basis, Falatko asked her why she had not reported it sooner, to which she replied that she thought he knew about since he was allegedly present during the roll call incident the night before.

In August 2007, a complaint was made that Burwell was wearing revealing clothing and showing too much of her chest, and Falatko spoke to her about proper attire. Following this discussion, Burwell asked for a follow-up meeting. On August 9, 2007, she met with Falatko and Lieutenant Weiland. During this meeting she told them both all the things that had been occurring, including the demeaning comments, sexual comments, vulgar language, other detectives refusing to work with her. In general, Falatko condoned the behavior of the detectives and failed to stop it. Following the incident in which Plaintiff was struck with a rubber ball,

Plaintiff yelled at Hauk, Lamb, and Zaborac while Falatko sat at his desk and took no action. Later that evening, Falatko asked Zaborac and Hauk what happened, both responded that nothing happened.  However, Falatko never spoke to Plaintiff about what happened and never did any further investigation.

### Defendant Boland

Boland became Burwell's supervisor in 2008.  Shortly after he took over, Burwell informed Boland that other detectives refused to work with her, but he never spoke to any of them about the issue.  When she requested assistance from him, Boland never ordered anyone to help her, but sometimes would help her himself.

Boland issued Burwell three counseling sessions during the time he supervised her.  One counseling was for making handwritten notes on the outside of case files, namely dates and times for interviews, though she alleges that this was common practice in the department.  However, Boland also issued three counselings during the same period of time to a male detective.

Boland also accused Burwell of being insubordinate based on her actions during the course of an investigation when she threw her hands in the air and said something to the effect of "not now, I need a few minutes".  Burwell states this was because she requested assistance on the matter, which was a Juvenile matter, and received none so she did not have ample time to complete the tasks Boland ordered and was simply indicating that she needed more time.

On April 16, 2008, Burwell alleges that Boland provoked her to lose her temper for which she was later given a three day suspension by Chief Settingsgaard.  Sergeant Boland had the address of a suspect Plaintiff needed to locate and interview and would not give it to Plaintiff, stating that he wished to interview the suspect with her.  A few hours later, Boland told Plaintiff

8

that he and another detective were going to interview a witness and informed Plaintiff that she would not be going and instead would be responsible for the paperwork for the case. Plaintiff informed Boland that he should take the case and complained that she was never allowed to do follow ups on her own cases. She then sat at her desk, at which time Boland pulled her hair clip and titled her chair back until she ultimately raised her voice, pointed her finger at his face and cursed at him.

### Chief Settingsgaard

Chief Steven Settingsgaard became Chief of the PPD on May 2, 2005. Settingsgaard became aware of the issues Plaintiff was experiencing sometime shortly after her complaint regarding the ball throwing incident on October 2, 2007. Plaintiff filed a complaint, and Settingsgaard ordered a formal investigation into the complaint on October 11, 2007. Following the complaint, it is undisputed that all comments of a sexual or inappropriate nature stopped, as did all ball throwing and stuffed bird throwing, and the atmosphere as a whole changed. Co-workers were guarded and apprehensive, but only toward Plaintiff, not to one another. The investigation resulted in a finding of all accusations being unsubstantiated, save for Lamb throwing the ball at Plaintiff. When Settingsgaard and Assistant Chief Korem met with Plaintiff to discuss the findings of the investigation, he informed her of the findings and suggested that he was aware of the type of atmosphere in the detective bureau, advising Plaintiff that things would improve if she improved her relationship with Hauk. He also suggested that she take advantage of seeing a mediator with Hauk, which she states that she did but Hauk declined.

The investigation was conducted internally by an investigator named Hlavacek. Prior to the investigation, Settingsgaard was advised by a City attorney that the normal course of the

9

process was to begin an internal investigation, then assist the Equal Opportunity Manager in their outside investigation.  However, in this case, the City's EO manager did not perform his own investigation, instead relying on the PPD's internal investigation to make findings.  The investigation purportedly gathered evidence against the Plaintiff's credibility but never asked any witnesses about the credibility of the other witnesses.  Additionally, department procedure dictates that no statements need be recorded, but Hlavacek recorded his interview with Plaintiff.  There is evidence that Hlavacek had some type of relationship, the level of which is disputed, with Defendant Falatko.  Likewise, Assistant Chief Korem expressed some belief to Chief Settingsgaard that Hlavacek was not completely neutral and may have a bias towards Plaintiff.

The effectiveness of the investigation is undisputed, as all parties agree that the harassment stopped, at least in the form it was manifested prior to the investigation.  However, Plaintiff states that following her complaint, the entire department began shunning her, which she perceived to be a direct response to her complaint.  Additionally, it is disputed as to whether Settingsgaard actually spoke to Lamb and Zaborac about their involvement in the incidents following the investigation.

On April 16, 2008, in an incident discussed *supra*, Plaintiff engaged in insubordinate conduct toward Sergeant Boland.  This ultimately resulted in a three day suspension from Chief Settingsgaard.  Prior to the suspension, a human resources employee, Joe Smith sent Settingsgaard information that he should perform a disciplinary record review of previous discipline issued for insubordination in the past ten years.  Also, he identified three cases where insubordination resulted in a one-day suspension.  Smith also stated that if her record was clean, which it was, along with a mitigating medical condition, that a one-day suspension should be

adequate.  However, after reviewing all relevant documentation, including a list of thirteen instances of insubordination which resulted in suspensions of less than three days and sometimes only in reprimands, Settingsgaard concluded that Plaintiff deserved a three-day suspension.

## DISCUSSION

### Title 42 U.S.C. § 1983

#### Color of Law

In order to sustain a cause of action under §1983, there must be a showing that the plaintiff was deprived of a right secured by the Constitution or federal law, and that it was done by someone acting under the color of law.  Parker v. Franklin County Community School Corp., 667 F.3d 910, 925 (7th Cir. 2012).  Mere employment by the state, although a factor to be considered, is not conclusive as to whether a defendant's actions are under the color of law.  Polk County v. Dodson, 454 U.S. 312, 321, 102 S.Ct. 445, 451, 70 L.Ed.2d 509 (1981).  In order to be in the gambit of §1983, the power must be conferred on the person by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.  Therefore they must in some way relate to the performance of the duties of the state officer.  Valentine v. City of Chicago, 452 F.3d 670, 683 (7th Cir. 2006).

There are a number of cases cited by both parties on this particular point.  In Murphy v. City of Chicago Transit Authority, 638 F.Supp. 464 (N.D. Ill. 1986), the plaintiff, a female, worked as a staff attorney for CTA and was subject to a series of demeaning and harassing remarks by fellow attorneys, all male.  The plaintiff complained to her supervisors who took no action and instead assigned her to menial tasks.  Id at 466.  There, the court found that the harassment could take place only by virtue of the fact that the defendants were her co-workers

and their jobs allowed them frequent encounters with her, and thus it could be said that contact with her was made possible only because the defendants had state authority, *i.e.*, their jobs.  Id at 468.  However, the court also concluded that they did not act under the color of law because their actions were not related to any state authority conferred on defendants.  Id.  The defendants were staff attorneys and the harassing behavior and vulgar comments had nothing to do with the nature of their jobs.  Id.

In Rouse v. City of Milwaukee, 921 F.Supp. 583 (E.D. Wis. 1996), a series of harassing remarks and gestures from a fellow officer were not considered to be under color of law because the harassment bore no relationship to the defendant's duties as a police officer.  There, the court found that calling the two female officers names, choking one of them on one occasion, commenting on his genitals, his ability to satisfy women, and other comments were unrelated to his duties as an officer and granted summary judgment.  Id.

In Fairley v. Andrews, 300 F.Supp. 2d 660 (N.D. Ill. 2004), the court found that a plaintiff's co-workers, all correctional officers, acted under color of law when they harassed and retaliated against him for reporting use of excessive force against inmates.  There the court said that correctional officers are responsible to investigate, report and prevent inmate abuse, and attempting to silence a colleague who reports excessive force is related to those duties.  Id at 665-666.

Similarly, in Anthony v. County of Sacramento, 845 F.Supp.1396 (E.D. Cal. 1994), a female sheriff's deputy brought a discrimination charge alleging that co-workers subjected her to an on-going campaign of sexual harassment and retaliation for defending African-American inmates.  The court found those actions to be under color of law because response to complaints

12

regarding treatment of inmates was directly related to the powers of law enforcement personnel. Id at 1401.

At a minimum, the refusal by Hauk, Lamb, and Zaborac to assist Burwell with her work assignments (i.e., interviews, reports, etc.) or maintain an effective working relationship relates to the performance of their duties as state officers, interfered with her ability to do her work, and could reasonably be determined by a jury to constitute actions under color of law.  Falatko's refusal to do anything about the Officer's refusal to assist Burwell in this regard, condoning their behavior as a supervisor, or otherwise responding to her complaints relates to the performance of his duties as a state officer and constitutes conduct under the color of law, as does Boland's allowing other officers to decline to help her, his refusal to include her in an interview on a case assigned to her, and his issuance of disciplinary action against her.  Finally, Settingsgaard's handling of her complaint and issuance of discipline is unquestionably an action directly related to the powers of law enforcement personnel and therefore under color of law.  To the extent that Defendants seek dismissal of Burwell's § 1983 claims on this basis, the Motions for Summary Judgment are denied.

### Hostile Work Environment

The analysis for a hostile work environment under §1983 and Title VII is the same, the only difference is that the former refers to the conduct of co-workers and the latter to conduct of supervisors and/or the employer.  In order to sustain a charge of hostile work environment, a plaintiff must establish: (1) the conduct was both objectively and subjectively offensive; (2) the harassment was based on her sex; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability.  Passananti v. Cook County, 2012 WL 2948524 at *6 (7th Cir.

13

2012).  There has been some discussion in the Seventh Circuit as to whether discriminatory intent is necessary to sustain a violation under §1983.  *See* <u>Huff v. Sheahan</u>, 493 F.3d 893, 902 (7th Cir. 2007)("we have stated, as the Sheriff concedes, that because the Constitution prohibits *intentional* discrimination by state actors, §1983 relief is available to a plaintiff claiming a hostile work environment only when she can demonstrate that the defendant acted with discriminatory intent."); <u>Salas v. Wisconsin Dept. of Corrections</u>, 493 F.3d 913, 926 (7th Cir. 2007)(in referring to cases which state discriminatory intent is an element "we have clarified that those cases are best read as simply emphasizing the requirement that §1983, like disparate treatment cases under Title VII, require ultimately proof of discriminatory intent.")(citations omitted).  Title VII hostile work environment claims are sustainable even if the plaintiff was not the direct target of the harassment if the plaintiff is in the protected class the conduct targets.  *See* <u>Yuknis v. First Student, Inc.</u>, 481 F.3d 552, 554 (7th Cir. 2007).  There is no bright line test for determining when a workplace becomes objectively hostile.

In order to show the conduct was severe or pervasive enough to rise to the level of hostile, it must have altered the conditions of Burwell's employment such that it created a hostile work environment.  <u>EEOC v. Management Hosp. of Racine, Inc.</u>, 666 F.3d 422, 432 (7th Cir. 2012).  Factors to consider include the severity of the alleged conduct, its frequency, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with her work performance.  <u>Gentry v. Export Packing Co.</u>, 238 F.3d 842, 850 (7th Cir. 2001).  The approach to analyzing hostile work environment is to consider the totality of the harassment rather than isolated incidents.

As to Hauk, Lamb and Zaborac, analyzing first the claim of a hostile work environment under §1983, the facts when viewed in the light most favorable to Burwell demonstrate that one existed.  As previously stated, many of the facts pertinent to the §1983 analysis overlap with Title VII, with the important distinction being that only those actions related to official duty will be considered under §1983.  Therefore, only those facts that show the officers failed to maintain an effective working relationship and failed in their role as senior officers to train and assist Plaintiff will be considered.

The facts which suggest the Officers were failing to assist a less experienced officer are that all three repeatedly refused to assist Burwell with investigations when she asked.  Specifically, Hauk, the most senior of the officers, refused to help Plaintiff interview suspects on a case to which he was assigned, when she had only been in the VCU for one week.  Lamb refused to help Plaintiff with a search warrant when she was new to the VCU.  Zaborac chose to prepare his daughter's birthday invitations rather than help Burwell on one occasion.  Refusing to assist Plaintiff with investigations and interviewing suspects, relegating her to menial roles such as taping interviews, shunning her, and making comments that women have no place in the VCU, all interfered with her ability to do her job effectively.  Likewise, they evince a failure to assist and train less experienced officers and failure to maintain effective working relationships, essential parts of their jobs.  Therefore, Hauk, Lamb and Zaborac's Motion for Summary Judgment is denied with respect to the claim of a hostile work environment under §1983.

With respect to Boland and Falatko, as sergeants, they are considered supervisors for purposes of establishing whether their actions fall under 42 U.S.C. §1983 and in order for them to be liable, they must have personal involvement in the harassment.  However, while they may

15

be subject to individual liability, they are not supervisors for purposes of establishing municipal or official capacity liability under Monell, because they lack the requisite policy and final decision making authority.[2]

It is alleged that Boland and Falatko used their supervisory authority to harass Plaintiff, in certain circumstances.  For instance, when Falatko was looking down Plaintiff's shirt as he spoke to her, she could not walk away because she could face disciplinary action for insubordination. Additionally, Falatko and Boland were aware of at least some of the problems with the other detectives failing to assist or maintain an effective working relationship with Plaintiff, and did not take action to ensure that the problem was remedied.  Failing to act with deliberate or reckless disregard for the plaintiff's rights or allowing unlawful conduct to continue despite knowledge by the supervisor constitutes personal involvement under § 1983.  Black v. Lane, 22 F.3d 1395, 1401 (7th Cir. 1994).  When exactly Falatko became aware of the problems is disputed; however, it is clear that at the latest, he was fully informed on August 9, 2007 when Plaintiff met with him and Lieutenant Weiland, yet he took no action to remedy the situation. There is also evidence suggesting that Boland personally refused a request for assistance from Burwell, relegating her to the more menial aspects of an investigation while he conducted the interview with another detective.  Whether these actions, or inaction as the case may be, were done with the intent to cause or condone a violation of Burwell's rights is for the jury to decide, and this portion of their Motion for Summary Judgment is denied.

---

[2] To further tangle the web, both are considered supervisors for purposes of establishing the level of municipal liability under Title VII, which has been discussed and will be further explained in the Title VII section of this Order.

The extent of Chief Settingsgaard's involvement is disputed by the parties. Both parties agree that the Chief was not aware of and therefore not liable for any actions that occurred prior to Plaintiff's complaint in October 2007. However, the parties dispute whether he is liable for the events that occurred thereafter, most notably Plaintiff being shunned, false allegations being leveled against Plaintiff, and a general failure to make any effort to improve conditions for Plaintiff in the VCU from October 2007 through 2009. Additionally, there is some evidence that Settingsgaard is the final decision maker with respect to discipline and considered the level of suspension that had been issued in the past for similar conduct before making his determination on Burwell's discipline. Accordingly, as he determined the length of and issued her suspension, he was personally involved in the conduct at issue here, and Plaintiff is entitled to have her hostile work environment claim against Settingsgaard decided by a jury. This aspect of Settingsgaard's Motion for Summary Judgment is therefore denied.

### Gender Discrimination

The two methods for analyzing discrimination based on gender are the direct and indirect methods. "Under the direct method, the plaintiff may avoid summary judgment by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." Coleman v. Donahoe, 2012 WL 32062 at *5 (7th Cir.2012). *See* United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 716 (1983)("There will seldom be 'eyewitness' testimony as to the employer's mental processes."). Evidence under the direct method has been divided into two categories: "(1) ambiguous statements or behavior toward other employees in the protected group that taken altogether allow an inference of discriminatory intent and (2) evidence of systematically better treatment of

employees outside the protected class." Coffman v. Indianapolis Fire Department, 578 F.3d 559,

563 (7th Cir. 2009). Burwell does not argue that she has direct evidence of gender discrimination.

Under the indirect or burden-shifting method, the plaintiff must first make a *prima facie*

showing that: (1) she was a member of a protected class; (2) she was meeting legitimate

employment expectations; (3) she suffered an adverse employment action; and (4) similarly

situated employees outside the protected class were treated more favorably than she was.

Benuzzi v. Board of Educ. of City of Chicago, 647 F.3d 652, 662 (7th Cir. 2011). Once that

showing is made, the burden shifts to the employer to proffer a non-discriminatory reason, and if

it does, then the burden shifts back to the plaintiff to show the reason is a pre-text. Id. It is not

enough to disbelieve the employer's proffered reason, the fact finder must believe the plaintiff's

explanation of intentional discrimination. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.

133, 147, 210 S.Ct. 2097, 147 L.Ed.2d. 105 (2000).

Here, with respect to the Officers, there is little, if any, evidence of discrete acts of

discrimination that relate to any duty they had as police officers. The actions of these Officers,

while abhorrent and childish as alleged, did not sufficiently impact Plaintiff's employment, as

they were co-workers and not in a position to take an adverse employment action against

Burwell. Accordingly, the Motion for Summary Judgment is granted as to the gender

discrimination claim under §1983 as to Hauk, Lamb and Zaborac.

In order for Boland and Falatko to be liable for gender discrimination pursuant to 42

U.S.C. §1983, they must have some personal involvement in the discrimination. Supervisory

liability pursuant to 42 U.S.C. §1983 can also be established by showing the conduct that caused

a constitutional violation occurred at the supervisor's direction or with the supervisor's

18

knowledge and consent and requires some causal link between the action complained of and the official.  Arnett v. Webster, 658, F.3d 742, 757-58, (7th Cir. 2011).

The critical distinction when analyzing Boland and Falatko's conduct, as well as that of Settingsgaard, with respect to gender discrimination as opposed to a hostile work environment is that gender discrimination requires a showing of an adverse employment action, at least as far as the analysis pursuant to 42 U.S.C. §1983.[3]  Therefore, in analyzing whether Boland and Falatko engaged in gender discrimination, the critical question is whether or not she suffered an adverse employment action.   An adverse employment action is one that "materially alters the terms and conditions of employment."  Stutler v. Ill. Dep't of Corr., 263 F.3d 698, 703 (7th Cir. 2001).  The adverse action must be something more than a mere inconvenience of an alteration of job responsibilities.  Rhodes v. Ill. Dep't of Transp., 359, F.3d 498, 504 (7th Cir. 2004).

The Seventh Circuit has recognized three categories of adverse employment actions which are actionable: (1) cases in which the employees compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduce the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe,

---

[3]Again, Title VII encompasses much more activity than §1983 because the analysis there does not require conduct related to authority conferred on the defendants by virtue of their status as state actors.

unhealthful, or otherwise significantly negative alteration in her workplace environment.  O'Neal

v. City of Chicago, 392 F.3d 909, 911 (7th Cir. 2004).

The only disciplinary actions initiated against Plaintiff by these sergeants were

counselings from Boland and whatever role he had in initiating the disciplinary action for

insubordination for which she was ultimately suspended by Chief Settingsgaard.  Here, the

counselings, in and of themselves, do not rise to the level of adverse employment actions.

Sweeney v. West, 149 F.3d 550, 556-57 (7th Cir. 1998).  Moreover, even if they did, it is

undisputed that a male detective received the same number of counselings from Boland as

Plaintiff during the same time period.  Burwell has therefore failed to demonstrate that a

similarly situated non-female officer was treated more favorably with respect to counselings, as

required to promote a reasonable inference of intentional discrimination.

A suspension without pay, however, is an adverse employment action. Plaintiff argues

that she was goaded into an argument by Boland during the incident which resulted in her

suspension and that it was unwarranted.[4]  It is noteworthy that the PPD appears to be run in a

para-military configuration, in which a superior officer's word and order is given authority.  With

that in mind, Plaintiff's actions in cursing at a sergeant, raising her voice to him, pointing her

finger in his face and essentially losing her temper in front of other officers can reasonably be

considered insubordination.  Burwell has not introduced evidence that could support the

reasonable inference that her write-up by Boland was motivated by gender rather than by the

reality that she was in fact insubordinate, or that another male officer was equally insubordinate

---

[4] It is unclear whether Burwell is actually arguing that she was not insubordinate or
whether she is only contesting the length of her suspension, as she seems to suggest both in her
briefs.

to Boland in public but was not written up.  As a result, Boland's action in writing her up for

insubordination cannot promote a reasonable inference of intentional discrimination on the

record before the Court.  Falatko and Bolland are entitled to summary judgment on this gender

discrimination claim.

As to Settingsgaard, Plaintiff argues that he went above and beyond what was necessary

in order to suspend her for three days.  As with Boland and Falatko, Settingsgaard's liability

under §1983 must be premised on personal involvement.  To that end, the parties agree that

Settingsgaard did not become aware of the harassing behavior Plaintiff alleges she was subject to

until she filed her complaint in October 2007.  She alleges that once he became aware of the

harassment, he initiated an investigation, but one that was so poorly executed and biased that it

essentially condoned the behavior.  She also argues that Settingsgaard was informed after the

investigation that she was being shunned and that the overall atmosphere of the VCU was in

many ways worse than before.  He failed to discipline any male officer in connection with the

complaint Plaintiff filed, ignored false allegations by Sergeant Wetzel made during the course of

the investigation, and did not order an investigation following Plaintiff's EEOC charges in March

and August of 2008.  Furthermore, when Plaintiff personally met with him in 2009 and informed

him that things were worse, he took no action.  Finally, Plaintiff argues that the length of the

suspension she received was unwarranted and disproportionate to others who engaged in similar

conduct.  The Court finds that there have been sufficient facts alleged that indicate that the issue

should proceed to trial, and Settingsgaard's Motion for Summary Judgment is denied in this

respect.

21

Though the only reference to either "direct" or "indirect" methods of proof is in

Plaintiff's Response brief as it pertains to retaliation, given that there is little if any direct

evidence of discrimination, this Court will follow the arguments contained in that section as to

the indirect method of proof as the facts that comprise each claim are largely duplicative.  Under

that method of analysis, it is undisputed that Plaintiff was a member of a protected class and that

she suffered an adverse employment action, *i.e.*, a three-day suspension, which presumably was

without pay.  So the remaining issues are whether Plaintiff was meeting legitimate employer

expectations and whether male officers were treated more favorably.

Plaintiff argues that she was meeting legitimate employment expectations and that any

argument to the contrary should be scrutinized because the employer is the one discriminating, it

follows that their subjective view of the employee's quality of work performance would be

biased.  In situations in which an employee admits wrong-doing but argues that they were

punished more harshly than employees outside the protected class, whether they were meeting

legitimate employment expectations is not necessary to the analysis.  Flores v. Preferred

Technical Group, 182 F.3d 512, 515 (7th Cir. 1999).  However, Plaintiff must still produce

sufficient evidence to raise the inference that the PPD applied its disciplinary measures in a

disparate manner.  In doing so, she must show that similarly situated employees outside the

protected class engaged in the same or similar conduct and yet were not punished as harshly.

Whether a fellow employee is similarly situated is a flexible, common sense question.

Henry v. Jones, 507 F.3d 558, 564 (7th Cir. 2007).  To show disparate discipline, the comparators

must: (1) deal with the same supervisors; (2) be subject to the same standards; and (3) have

engaged in conduct of a similarly serious nature without such differentiating or mitigating

22

circumstances as would distinguish their conduct or the employer's treatment of them.  Peele v. Country Mut. Ins. Co., 288 F.3d 319, 330 (7th Cir. 2002).

The instances cited by Plaintiff that pre-date Settingsgaard's tenure as Chief are not pertinent to the analysis and cannot be considered as examples of disparate punishment because Settingsgaard was not the decision-maker until 2005.  Plaintiff first argues that Hauk was insubordinate in December 2008 because he failed to timely complete a report regarding a homicide, which ultimately jeopardized an investigation, after being ordered to do so by superior officers.  This is labeled as insubordination, and may well be, but it is not the same type of conduct in which Plaintiff engaged.  Plaintiff also alleges that Hauk was publicly insubordinate to a sergeant by refusing to work on a case in May 2010.  But, as a result of that insubordination, Hauk received a two-day suspension.  Hauk's next act of insubordination for refusing to report to an arson crime-scene to perform an investigation, received a three-day suspension, but is not sufficiently similar to Burwell's conduct.  That being said, the fact that Hauk received the same level of discipline after multiple, arguably more serious infractions as Plaintiff did for her first infraction may be considered in assessing whether disciplinary actions were applied disparately based on gender.

Plaintiff next argues that a fellow officer, Ed Gaffney, was insubordinate by repeatedly refusing a supervisor's request to speak to him in private.  This conduct is more in-line with Plaintiff's, yet Gaffney was given a two-day suspension that was later rescinded.  Plaintiff argues that because Settingsgaard rescinded the suspension, an inference of disparate discipline arises.  Settingsgaard stated in his deposition that he rescinded the suspension in an attempt to help a nearly retired officer to reclaim the last of his few years as an officer.  However, this raises a

sufficient question as to the reason for rescinding the suspension for Gaffney and refusing to do so for Plaintiff, especially when the former had a history of trouble with superior officers.  It is ultimately up to the jury to decide whether to believe Settingsgaard's explanation or alternatively to find Burwell's version to be more credible.

Officer Joe Spears was not disciplined for leaving work after refusing a sergeant's order to perform a task.  Settingsgaard explained that he was close to retirement and also that when Spears returned to work, the sergeant that had made the order considered the matter closed and was not seeking discipline against him.   Again, the credibility decision on this comparable must be made by the jury rather than this Court on summary judgment.

Other examples offered are that of an officer refusing to follow an order for which he was not disciplined, and a sergeant making insubordinate comments about the administration.  The first is not the same type of conduct in which Plaintiff engaged, and the Sergeant is not a similarly situated employee because Plaintiff, though a detective, was only an officer.

Given the similarity in conduct and rank with Gaffney and Spears, and the difference in punishment, a sufficient factual dispute has been set forth allowing her gender discrimination claim to proceed to the jury against Settingsgaard, and his Motion for Summary Judgment is therefore denied in this respect.

### Municipal Liability

In order for a municipality to be liable under §1983, a plaintiff must establish a policy or custom that gave rise to the constitutional violation.  Monell v. Dep't of Social Servs, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Gable v. City of Chicago, 296 F.3d 531, 537-38 (7th Cir. 2002).  An unconstitutional policy may be established by showing: (1) an express policy

that, when enforced, causes a constitutional deprivation; (2) a widespread practice, that although not authorized by law, is so well settled and permanent that is constitutes a custom or policy with the force of law; or (3) an allegation that a constitutional injury was caused by someone with final policymaking authority.  Garrison v. Burke, 165 F.3d 565, 571-72 (7th Cir. 1999)(internal quotations and citations omitted).

Plaintiff attempts to establish a widespread practice of harassment and discrimination dating back to many years before Settingsgaard ever became Chief of Police.  Defendants suggest that this evidence is irrelevant because it predates the implementation of the City's 2005 Workplace Violence and Anti-Harassment Policy.  While the existence of an anti-harassment policy is part of the record to be considered, it does not in and of itself negate the possibility that a custom or policy of discrimination or harassment continued to be perpetuated in the PPD. Plaintiff may be able to present some form of this claim at trial.  However, the Court is concerned about the relevance of the broad scope of the evidence that she apparently intends to introduce.  Accordingly, the Court will address this issue during the Pretrial Conference and in motions in limine before issuing a final ruling.

Burwell also contends that municipal liability can be predicated on Settingsgaard's functioning as the final policymaker with respect to disciplinary proceedings.  Whether Settingsgaard is charged with final policymaking authority is a question of state law.  Pembaur v. Cincinnatti, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d (1986); Abbot v. Village of Winthrop Harbor, 205 F.3d 976, 983 (7th Cir. 2000)  In determining whether an official is a final policy or decision maker, it is helpful to look into: (1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in

question is subject to meaningful review; and (3) whether the policy made by the official is in the breadth of authority possessed by the official.  City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988).  In connection with the suspension decision in this case, the record supports the conclusion that Settingsgaard acted as a final policymaker for the PPD despite the existence of a grievance procedure, thereby providing a basis for a claim of municipal liability against the City for gender discrimination.  Accordingly, this portion of the City's Motion for Summary Judgment is denied.

### Retaliation

Although Burwell references a retaliation claim under § 1983 in her Amended Complaint, analysis regarding such a claim is conspicuously absent from her responses to the pending Motions for Summary Judgment.  Specifically, the only analysis the Court has found is with respect to a retaliation claim against the City based on the actions of Settingsgaard and possibly the two Sergeants under Title VII.  Thus, to the extent that Burwell intended to pursue any separate claim for retaliation under § 1983, her claim is perfunctory and undeveloped and is therefore waived. Finance Investment Co. v. Geberit AG, 165 F.3d 526, 1998 WL 890372, at *1 (7th Cir. Dec. 23, 1998) (finding a perfunctory and undeveloped argument to be waived); Indurante v. Local 705, International Brotherhood of Teamsters, 160 F.3d 364, 366 (7th Cir. 1998); Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 668 (7th Cir. 1998), cert. den., 119 S.Ct. 890 (1999).   Thus, all Defendants are entitled to Summary Judgment on Plaintiff's § 1983 retaliation claim.

**Qualified Immunity**

In <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982), the United States Supreme Court

enunciated the "modern standard to be applied in qualified immunity cases." <u>Auriemma v. Rice</u>,

895 F.2d 338, 341 (7th Cir. 1990). The Court stated:

> Governmental officials performing discretionary functions generally are
> shielded from liability for civil damages insofar as their conduct does not
> violate clearly established statutory or constitutional rights of which a
> reasonable person would have known.

<u>Harlow</u>, 457 U.S. at 818. The test for qualified immunity is "whether the law was clear in

relation to the specific facts confronting the public official when [he or she] acted." <u>Green v.</u>

<u>Carlson</u>, 826 F.2d 647, 649 (7th Cir. 1987). In deciding whether a defendant will enjoy qualified

immunity, courts must determine:  "(1) whether the plaintiff has asserted a violation of a federal

right, and (2) whether the constitutional standards implicated were clearly established at the time

in question." <u>Eversole v. Steele</u>, 59 F.3d 710, 717 (7th Cir. 1995), *citing* <u>Kernats v. O'Sullivan</u>,

35 F.3d 1171, 1176 (7th Cir. 1994). The first issue is a threshold one. If the plaintiff fails to state

a violation of a federal right, then the plaintiff's claim fails altogether and the court need not go

on to decide whether the law was clearly established at the time of the offense. *See* <u>Marshall v.</u>

<u>Allen</u>, 984 F.2d 787, 793 (7th Cir. 1993); <u>Zorzi v. County of Putnam</u>, 30 F.3d 885, 892 (7th Cir.

1994); <u>Eversole</u>, 59 F.3d at 717. "To be clearly established, a right must be sufficiently clear that

every 'reasonable official would have understood that what he is doing violates the law.'"

<u>Raichle v. Howards</u>, 2012 WL 1969351, at *4 (June 4, 2012).

The Court has found that Burwell has asserted violations of her federal rights with respect

to her hostile work environment sexual harassment and gender discrimination claims. The

27

Officer Defendants argue that they are nevertheless entitled to qualified immunity, as comments related to Burwell only having her job because of her father, throwing objects at her, prank photo-shopping of pictures, flicking water, failure to help in connection with work responsibilities, looking at her through a mirror, calling her fat, etc., were not clearly contrary to established law.  By 2001, the Seventh Circuit had held that, "Harassment is not limited to acts of sexual desire, but rather is a broad term which 'encompasses all forms of conduct that unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive working environment.'" Haugerud v. Amery School Dist., 259 F.3d 678, 692 (7th Cir. 2001), *citing* McKenzie v. Ill. Dep't. of Transportation, 92 F.3d 473, 479 (7th Cir. 1996). Specifically, conduct such as questioning the plaintiff's abilities and the ability of women to do her job in general, increasing her duties in an attempt to make her quit, withholding necessary assistance or the tools to do her job, and making discriminatory comments was found to be sufficient to state a claim for hostile work environment sexual harassment.  Id., at 694.  The facts of this case are readily analogous to the situation in Haugerud, and there is no indication in the record that male employees were subjected to this type of behavior.  Additionally, the facts demonstrate conduct greater than the kind of simple teasing, offhand comments, isolated incidents that have been held to be insufficient to amount to discriminatory changes in the terms and conditions of employment.  As a result, the Court finds that reasonable officers in Defendants' positions would have understood that their conduct violated the law, and their request for qualified immunity in their Motion for Summary Judgment is denied.

     With respect to the supervisory Defendants Boland, Falatko, and Settingsgaard, the law is well-settled that supervisors can be liable for the conduct of subordinates if they know about it,

28

facilitate, condone, approve, or turn a blind eye to it. Black v. Lane, 22 F.3d 1395, 1401 (7th Cir. 1994). If the law was sufficiently clear that the Officers knew or should have known that their conduct as alleged violated the law, then their supervisors either knew or should have known that failing to take action to stop the misconduct would also violate the law. As such, Defendants Falatko, Boland, and Settingsgaard's request for qualified immunity in the Motions for Summary Judgment is likewise denied.

### Title VII

#### Hostile Work Environment

As set forth previously with respect to the § 1983 claim, in order to sustain a charge of hostile work environment, a plaintiff must establish: (1) the conduct was both objectively and subjectively offensive; (2) the harassment was based on her sex; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability. Passananti, 2012 WL 2948524 at *6 (7th Cir. 2012). Title VII hostile work environment claims are sustainable even if the plaintiff was not the direct target of the harassment if the plaintiff is in the protected class the conduct targets. See Yuknis v. First Student, Inc., 481 F.3d 552, 554 (7th Cir. 2007).

The evidence and analysis for this claim is largely duplicative of the § 1983 claim discussed above. However, there is a slight difference between § 1983 and Title VII hostile work environment claims in that Title VII does not require actions to be under the color of law, which allows a broader scope of alleged misconduct to be considered. Additionally, the proper defendant under Title VII is the employer rather than individuals. That being said, an employer can only act through its employees, making the conduct of the named Defendants relevant here as well.

It bears mentioning at this point that the proper way to analyze whether the conduct was severe or pervasive enough to be hostile is to examine the totality of the circumstances, which includes the conduct of Hauk, Lamb, and Zaborac, who are co-workers, as well as the conduct of Boland and Falatko and Settingsgaard, who are supervisors.  All instances of harassment are relevant to proving that an environment is sufficiently severe or pervasive.  Mason v. S. Ill. Univ. at Carbondale, 233 F.3d 1036, 1045 (7th Cir. 2000).  However, co-worker conduct and supervisor conduct must be separated in order to determine employer liability.  Id.

The Court has already found that the conduct of the individual Defendants was severe and pervasive enough to support a hostile work environment claim.  In addition to the conduct deemed under the color of law previously in this Order, Zaborac threw candy down her shirt, made weekly comments that the two of them should "get together," and made inappropriate comments about Plaintiff's breasts such as that she had "awesome big boobs."  Hauk kept a mirror on his desk that he used to stare at her while she worked at her desk and made repeated derogatory comments to her, including telling Burwell that "It's a man's world in Violent Crimes" and falsely accusing her of not following proper procedures.  Lamb called her fat while she was pregnant and threw a rubber racquet ball at her so hard that it left a bruise.  She was told by another officer in the VCU that she had to run around the desk topless in order to be initiated into the VCU; Hauk, Lamb, and Zaborek laughed at and encouraged this comment.  She was struck with a rubber ball and stuffed bird and the same were thrown at her while she was working at her desk.  Also, all the officers, and sergeants, allegedly looked down her shirt, or attempted to look down her shirt, and shunned her.  Boland, more than once, pulled her hair clip and tilted her chair back, and Falatko tried to look down her shirt while he was speaking with her.

30

Some of the evidence Plaintiff argues contributed to a hostile work environment is neither actionable nor persuasive.  For instance, Zaborac sending an altered photo of Plaintiff with a black eye, missing teeth, and the word "witch" written on the forehead is not objectively offensive and apparently it was not subjectively offensive because Plaintiff sent Zaborac an altered photo of himself with make-up after he sent the original photo.  Also, not allowing Plaintiff to hang her coat on a partition in the office and asking her to complete her reports in a manner that she perceived to be different is not objectively offensive.  Finally, the incident where a nude picture of Burwell on her own phone was accessed by Hauk and sent to another officer while they were at a bar is conduct in a social setting that is separate and distinct from conduct occurring in her work environment.

Having determined that a hostile work environment existed, the next question is whether there is a basis for employer liability.  Whether there is a basis for employer liability rests on whether the discriminatory conduct was carried out by a supervisor or by co-workers.  *See*, *e.g.*, Faragher v. City of Boca Raton, 524 U.S. 775, 807-08, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).  If the supervisor is the harasser, there is strict liability for the employer, with the possibility of an affirmative defense if the plaintiff suffered no tangible employment action.  Parkins v. Civil Constr. of Ill. Inc., 163 F.3d 1027, 1032 (7th Cir. 1998).  If no tangible employment action is taken, the employer may raise an affirmative defense that is comprised of two elements: (1) the employer exercised reasonable care to prevent and promptly correct any harassing behavior; and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer.  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1999); Faragher, 524 U.S. at 807-8.  If co-workers are

31

responsible for the hostile work environment, the employer can only be liable if there is proof

that the employer has been negligent in either discovering or correcting the harassment.  <u>Parkins</u>,

163 F.3d at 1032.  However, an employer may discharge its liability by taking reasonable steps to

discover and correct the harassment of its employees.  <u>Id</u>.  The employer's response must be

reasonably calculated to prevent further harassment under the particular facts and circumstances

of the case.  <u>Cerros v. Steel Technologies, Inc.</u>, 398 F.3d 944, 953 (7th Cir. 2005).  This case

involves both supervisory and non-supervisory harassment.

The analysis begins with the three officers who contributed to the hostile work

environment as co-workers.  The PPD is therefore liable only if it was negligent in discovering

and correcting the harassment.  It is undisputed that the PPD became aware of the problems, at

the latest, following Burwell's complaint on October 8, 2007.  Plaintiff argues that telling

Sergeant Orwig that Hauk and Zaborac were making comments about her only receiving her

position by virtue of the her father, shows that the PPD knew of the harassment at an earlier date.

This is not compelling, as the fact that her father held a high-ranking position with the PPD and

was friends with the assistant chief is simply a fact of life, and there has not been a sufficient

showing that this particular instance of negative treatment was based on her gender rather than

her relationship to her father.

Plaintiff maintains that she did repeatedly inform her sergeants that she was routinely not

receiving assistance from other detectives and was being relegated to minor, insignificant roles

during investigations.  Also, she complained to Weiland and Falatko that she was not getting

help and was being harassed, and Weiland offered her his personal phone number to discuss any

issues that may arise in the future.  Plaintiff states that Falatko was in his office, apparently

located in the same area or within ear shot of the other detectives, as they harassed her.  At a minimum, the record could reasonably support the inference that the PPD was negligent in discovering the harassment considering the number of times this behavior occurred.  The anti-harassment policy instructs a person who feels they are being harassed, or who notices harassment taking place should, among other things, report that behavior to a supervisor or manager.  Plaintiff did this prior to filing her formal complaint, yet no action was taken.

Once the formal complaint was filed, Settingsgaard initiated an investigation and it is undisputed that the harassment, in the forms it was being perpetrated, stopped.  Perhaps this is because there is evidence in the record indicating that the alleged perpetrators of the harassment were not spoken to regarding the results of the investigation or told to cease their behavior.  Simply because the harassment stopped in close temporal proximity to the investigation does not necessarily mean it was reasonably calculated to prevent further harassment.  The Plaintiff argues the investigation was not a reasonable response because it was not conducted in a manner consistent with PPD and City of Peoria policy, and the investigator was biased.

The record indicates that the City and PPD did not follow the pre-established procedures for conducting an investigation, including the City's Equal Opportunity (EO) manager not being fully informed of the conduct for which he was charged with investigating.  Instead, an internal affairs officer, who was rumored to be friends to some degree with one of the people being investigated was appointed to conduct the investigation.  That fact alone, could arguably cast doubt on the integrity of the investigation, or a the very least create a question of fact for the jury, and there has been no explanation offered as to why another internal affairs officer or an independent investigator, such as one from the City's EO department was not appointed when

that fact came to light.   The remainder of the allegations regarding Hlavacek's role in the investigation amount to whether he was sufficiently thorough in his investigation and whether he followed normal procedure such as audio-taping interviews, etc.  These are less compelling than the previously mentioned facts.

While all parties agree that the initial behaviors complained of, *e.g.*, ball throwing, inappropriate comments about Plaintiff's breasts, staring down her shirt, etc., stopped following the complaint, there is some disagreement as to why it stopped.  Fortuitous timing between an investigation and harassment stopping does not necessarily indicate the investigation was effective, especially when considering whether it was likely to prevent further harassment. Certainly, Settingsgaard speaking to the officers who Plaintiff mentioned in her complaint would have been far more effective toward the goal of preventing further harassment than failing to do so.  In fact, failing to speak with them promotes the inference that their actions were condoned. In any event, there has been sufficient evidence presented that raises questions regarding the reasonableness of the efforts to discover any harassment, as well as the effectiveness of the investigation and/or efforts to correct and prevent further harassment that the City's Motion for Summary Judgment is denied as to this aspect of Plaintiff's hostile work environment claim under Title VII.

Even if the analysis came to the contrary conclusion, the City is strictly liable for the actions of its supervisors if Plaintiff suffered a tangible employment action.  The key to determining whether a person is actually a supervisor, or just called one, turns on the extent of authority the individual possesses.  Parkins, 163 F.3d at 1033.  The power to effect the terms of employment such as hiring, firing, promoting, transferring, or disciplining is key to determining

whether a person is a supervisor, and a supervisor must possess at least some of these powers.
Id.

Here, there can be no credible dispute to the assertion that Settingsgaard is a supervisor.
The dispute arises with respect to Defendants Falatko and Boland.  The Collective Bargaining
Agreement between the City and the PPD gives sergeants the power to initiate discipline up to
and including an oral reprimand, the lowest level of discipline listed, and one that may be
expunged one (1) year after its issuance.  In the "Nature of Work" section of the job description
of a sergeant in the PPD policy manual, sergeants evaluate work performance of subordinates;
recommend merit increases; initiate disciplinary action; hear grievances; control employee
schedules and participate in hiring and firing decisions. It is also clear from the briefs that Boland
and Falatko controlled daily assignments and that the para-military configuration of the PPD
made subordinates accountable for failing to follow the order of a superior officer, like a
sergeant.  Therefore, for purposes of imputing employer liability under Title VII, Boland and
Falatko are also treated as supervisors.

Following Boland's write up of Burwell for insubordination, Plaintiff was suspended for
3 days by Settingsgaard.  A three-day suspension is a tangible employment action, but the
question is whether the tangible employment action was related to the harassment and
discrimination.  The parties agree that the confrontation between Burwell and Boland was the
source of the suspension, but they disagree as to whether the suspension was tied to the
harassment.  Plaintiff argues that the suspension was unmerited in length and that Boland
provoked her to argue with him.  The City argues that her behavior warranted the suspension and
points out that Plaintiff is merely arguing the length of the suspension, not the fact of the

suspension.  The Court concludes that there are sufficient disputes of material fact pertaining to this issue that summary judgment must be denied, and a jury will decide this question.   Finally, because Plaintiff suffered a tangible employment action, the Faragher/Ellerth defense is unavailable.

### Gender Discrimination

Given that the standard for proving gender discrimination and the analysis applying the material facts of this case to the law is substantially the same for Title VII and it is for § 1983, the Court finds that the same result should necessarily follow.  Much of the evidence she cites is the conduct of co-workers, not that of the employer, and stray remarks are not actionable.  As with the discussion in connection with her § 1983 claim, the only discrete action presented in the record that rises to the level of an actionable adverse employment action is her three-day suspension by Settingsgaard, and she has made a sufficient showing of disparate treatment to survive summary judgment.  On the record before the Court, a reasonable jury could find that Settingsgaard's actions in suspending Burwell provide the predicate for employer liability on this claim.  Accordingly, for the reasons set forth previously in this Order, the City's Motion for Summary Judgment is denied in this respect, and Plaintiff's Title VII gender discrimination claim will be decided by the jury.

### Retaliation

In order to make a direct case of retaliation, a plaintiff must demonstrate that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the two.  Sitar v. Ind. Dep't of Transp., 344 F.3d 720, 728 (7th Cir. 2003).  Retaliation may also be shown through the indirect, burden-shifting method, which

requires proof that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; (3) she was meeting her employer's legitimate expectations; and (4) similarly situated employees who did not engage in the protected activity suffered no adverse employment action.  Squibb v. Mem. Med. Ctr., 497 F.3d 775, 788 (7th Cir. 2007).  Plaintiff argues that she is proceeding under the indirect method against the City.

Again, the only actionable adverse employment action presented in this case is the three-day suspension by Settingsgaard.  In the context of a disparate discipline case, the element of whether the plaintiff was meeting her employer's legitimate expectations may be excused, as it makes little sense to analyze performance under the circumstances.  Flores v. Preferred Technical Group, 182 F.3d 512 (7th Cir. 1999).  With respect to her suspension, Plaintiff argues that though she may have been insubordinate to Boland, similarly situated insubordinate employees who did not file a discrimination complaint were punished less severely.  This amounts to an argument that her punishment was a pretext for gender discrimination.  See Curry v. Menard, Inc., 270 F.3d 473, 478 (7th Cir. 2001).

As discussed previously in connection with Burwell's gender discrimination claim, she has introduced evidence from which a jury could reasonably conclude that male officers received preferential treatment in terms of less harsh disciplinary decisions.  Burwell notes that these male officers had also not filed discrimination complaints and argues that this is an additional reason for the differential discipline.  Evidence concerning comparable employees may satisfy a plaintiff's burden under the prima facie case, as well as to demonstrate pretext.  Coleman v. Donahoe, 667 F.3d 835, 853 (7th Cir. 2012).  Although the City has offered what it asserts are legitimate, non-discriminatory reasons for the differences in discipline, the presence of genuine

issues of material fact in the record mandates that a jury determine whether the City's explanations are worthy of credence or are merely a pretext for retaliation.  The City's Motion for Summary Judgment must therefore be denied in this respect.

### Assault and Battery

Finally, Burwell asserts a claim for assault and battery against Defendants Boland, Hauk, Zaborac, and Lamb.  The claim against the three Officers is predicated on their throwing the rubber ball and stuffed animal at her on various occasions.  With respect to Boland, the only conceivable allegation that could be in any way construed as a assault or battery would be the incident where he tipped her chair back and pulled on her hair clip.

To state a claim for assault, a plaintiff must demonstrate a threatening gesture, or an otherwise innocent gesture made threatening by the accompanying words, that creates a reasonable apprehension of an imminent battery.  Kijonka v. Seitzinger, 363 F.3d 645, 647 (7th Cir. 2004.)  Of the instances described above, only the one time on October 8, 2007 when Lamb faked throwing the rubber ball at her twice before actually throwing the ball hard enough to leave a bruise on Burwell's breast could arguably be construed as an actionable claim of assault.  Even when construed in the light most favorable to the Plaintiff, the other instances fail to demonstrate a threatening gesture, gesture made threatening by accompanying words, or reasonable fear of a battery as a matter of law.  Accordingly, the Motion for Summary Judgment is denied with respect to the assault claim against Lamb and granted as to Boland, Hauk, and Zaborac.

Under Illinois law, battery requires a showing of an "'unauthorized touching' of another that 'offense a reasonable sense of personal dignity.'"  Chelios v. Heavener, 520 F.3d 678, 692 (7th Cir. 2008).  The claim against Boland is without merit.  Suggesting that his pulling on her

hairclip or tilting her chair back to bounce it when she concedes that there was no injury of any kind, the most that amounted from touching the hair clip was that her hair fell down on one occasion, and that she found the behavior irritating barely passes the red face test, much less demonstrates conduct that would offend a reasonable sense of personal dignity. Accordingly, Boland is entitled to summary judgment on this claim.

The same cannot be said for incidents involving the repeated ball throwing, as she has indicated that she would often be hit by the balls thrown at her. A reasonable person would be offended by being hit by rubber racquet balls that had been thrown at them repeatedly and unexpectedly while they were working. Accordingly, Burwell has done enough to allow her battery claim to go forward against Hauk, Lamb, and Zaborek, and their Motion for Summary Judgment to the contrary must be denied.

## CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment by Defendants Hauk, Lamb, Zaborac, Falatko, and Boland [55] is GRANTED IN PART and DENIED IN PART, and the Motion for Summary Judgment by Settingsgaard and the City [57] is GRANTED IN PART and DENIED IN PART. The claims remaining for trial are as follows: (1) a § 1983 claim for hostile work environment against all Defendants; (2) a § 1983 claim for gender discrimination against Settingsgaard and the City pursuant to municipal liability; (3) a Title VII claim for hostile work environment against the City; (4) a Title VII claim for gender discrimination against the City; (5) a Title VII retaliation claim against the City; (6) a state law assault claim against Lamb;

and (7) a state law battery claim against Hauk, Lamb, and Zaborac.  This matter remains set for final pretrial conference on December 12, 2012.

ENTERED this 19th day of October, 2012.


s/ James E. Shadid_____
James E. Shadid
Chief United States District Judge